# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                CASE NO. 22-20055-01-DDC

MOHAMMAD RAFI,

        Defendant.

## GOVERNMENT'S SENTENCING MEMORANDUM
### (PRESENTENCE REPORT OBJECTIONS)

APPEAR NOW the United States of America, by and through undersigned counsel, and respectfully submit its Sentencing Memorandum addressing Defendant Mohammad Rafi's objections to the Presentence Report (PSR).

For the reasons below, the Court should deny Mr. Rafi's objections to the PSR and find the guideline range of imprisonment is 60 months, the statutory maximum for Mr. Rafi's crime of conviction.

I.     PROCEDURAL HISTORY

    A.     Pre-Conviction

On October 15, 2022, a Complaint was issued charging Mr. Rafi with making a false statement in violation of 18 U.S.C. § 1001.     (Doc. 1, Complaint.)

Federal Bureau of Investigation ("FBI") agents arrested Mr. Rafi the next day at Kansas City International Airport.     (Doc. 2, Arrest Warrant.)

The Magistrate Judge conducted Mr. Rafi's initial appearance on October 19, 2022, scheduling his detention and preliminary hearing.     (Doc. 3, Minutes.)

On October 24, 2022, Mr. Rafi appeared in court, waived his right to a preliminary hearing on the Complaint and the government withdrew its request for pretrial detention.     (Doc. 6, Minutes; Doc. 7, Waiver.)     The Court also set conditions of release for Mr. Rafi.     (Doc. 8, Order Setting Conditions.)

On November 16, 2022, the Grand Jury returned an Indictment charging Mr. Rafi with the same violation as was charged in the Complaint.     (Doc. 10, Indictment.)     The charge alleged that on August 12, 2019, Mr. Rafi made a false statement to the United States Department of Defense within his application for a security clearance to secure a contract linguist position. Specifically, Mr. Rafi falsely denied "EVER associat[ing] with anyone involved in activities to further terrorism."

Due to the nature of some of the discovery materials in this case, the parties agreed to a protective order, which the Court entered on December 21, 2022.   (Doc. 18, Order.)   Other aspects of the discovery for this case were atypical, so the Court designated it as complex under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7).   (Doc. 22, Order.)

### B.   Guilty Plea

On December 30, 2024, Mr. Rafi submitted a petition to plead guilty and pled guilty to the sole count in the Indictment, without a plea agreement.   (Doc. 42, Minutes; Doc. 44, Petition to Enter Plea of Guilty.)   Since there was no plea agreement, the United States submitted a factual basis to support Mr. Rafi's guilty plea.   (Doc. 41, Plea Factual Basis.)   The Court ordered a presentence investigation and report be prepared by the U.S. Probation Office.

### C.   PSR

Mr. Rafi has lodged seven objections to the PSR.   Those objections, the government's response to those objections, Mr. Rafi's replies to some of those objections, and the Probation Office's response to the objections are all contained in the PSR, which was filed on June 18, 2025.   (Doc. 49, PSR.)

The PSR determined the base offense level to be 6, pursuant to U.S.S.G. § 2B1.1.   *Id.* at ¶ 32.   The PSR found no specific offense characteristics

applicable.  *Id.* at ¶ 33.   The PSR did find the crime of conviction "involved, or was intended to promote, a federal crime of terrorism," so 26 levels were added pursuant to U.S.S.G. § 3A1.4.   *Id.* at ¶ 34.   That makes the adjusted offense level to be 32.   *Id.* at ¶ 37.   With the three-level reduction for acceptance of responsibility (*id.* at ¶¶ 39-40), the total offense level is 29.   *Id.* at ¶ 41.

Mr. Rafi has no criminal history, which would normally place him in Criminal History Category I.   However, the enhancement pursuant to U.S.S.G. § 3A1.4, requires he be considered as being in Criminal History Category VI.   (Doc. 49, PSR at ¶¶ 45-46.)

With an offense level of 29 and criminal history category of VI, the guidelines range is 151-188 months.   However, Mr. Rafi's conviction carries a statutory maximum sentence of five years, so his guideline range becomes 60 months.   *Id.* at ¶ 74.

D.   Objections to PSR

Mr. Rafi lodged seven objections to the PSR.

1.   Paragraph 12's conclusion that he "answered a question falsely.   *Id.* at ¶ 118.

2.   Paragraph 13's conclusion that he "similarly answered

questions falsely in the course of procuring naturalization and United States citizenship." *Id.* ¶ 137.

3.    Paragraph 14's conclusions about his answers on his November 12, 2018; April 26, 2019; and June 17, 2019 application and/or forms.   *Id.* ¶ 153.

4.    Paragraph 21's statement "that the only reason that he obtained the government linguist position with the U.S. Department of Defense was to help in any way facilitate the release of Muslimyar and others who were arrested alongside him."   *Id.* ¶ 158.

5.    Paragraph 34's 26-level enhancement predicated on the information contained in paragraph 21.   *Id.* ¶ 186.

6.    Paragraph 38 should include the Zero-Point Offender two-level reduction under U.S.S.G. § 4C1.1 because the terrorism enhancement under U.S.S.G. § 3A1.4 was incorrectly applied.   Doc. 49, PSR at ¶ 212.

7.    Paragraph 107's requirement that he pay costs for the computer monitoring and/or management condition of supervised release.   *Id.* ¶ 218.

The parties met and conferred following the evidentiary hearing on July 14, 2025, to address these objections and the upcoming process and hearings. The parties agree that Objections #1-3 do not require a specific ruling on these disputes as they do not impact the guideline calculations.   *See* Fed. R. Crim. P. 32(i)(3)(B).   Alternatively, should the Court consider the dispute within those objections in determining the sentence in this case, the nature or extent of the alleged false statements are connected or intertwined with the objections addressing the guideline calculations, so could be addressed in that manner.

The parties agree that Objections #4-6 are interconnected.   A ruling regarding the factual dispute lodged in Objection #4 will logically lead to the decisions for Objections #5 and #6.

The parties agree that Objection #7 stands by itself, requiring the Court to resolve that dispute.

### E.   Sentencing Process

The Court and the parties recognized a decision about the application of the U.S.S.G. § 3A1.4 Terrorism Enhancement is the primary focus initially in the sentencing process.   Whether the enhancement applies to Mr. Rafi influences the presentation and argument of the parties advocating for a specific sentence.   Whether the enhancement applies in this case is not a simple

6

calculation, which is why the parties submitted a Memorandum of Law before the evidentiary hearings began.    (Doc. 50, Joint Statement of Law.)

In that Memorandum, the parties sought to provide a framework for the analysis as evidence was presented to determine if the enhancement applies.

Because Mr. Rafi's objections challenged certain facts in the PSR regarding the Terrorism Enhancement, the government presented evidence in support of the PSR's factual allegations and conclusions.    The evidentiary hearing began on June 27, 2025 (doc. 51, Minute Entry), and concluded on July 14, 2025 (doc. 52, Minute Entry).

Because Mr. Rafi's PSR objections challenge facts in the PSR, which the government addressed through the presentation of evidence, transcripts of those two hearings were obtained to aid in the drafting of these pleadings.    *See* Doc. 53, Transcript of Sentence Hrg., Vol. 1; Doc. 54, Transcript of Sentence Hrg., Vol. 2.

As the government bears the burden to establish the application of the Terrorism Enhancement, the government submits this Memorandum slightly more than three weeks after the transcripts were made available to the parties. Mr. Rafi will submit his responsive Memorandum in two weeks.    *See* Doc. 55, Order.

Subsequently, the parties expect the Court to rule upon Mr. Rafi's objections. Then, the parties will submit any additional sentencing memoranda or materials to aid the Court in determining a sentence under 18 U.S.C. § 3553(a).

II.    FACTUAL BACKGROUND

Two of the investigating agents testified and the government submitted the video recording of Mr. Rafi's post-arrest interview during the evidentiary hearings on June 27, 2025, and July 14, 2025. During the testimony on June 27, twenty clips from that video recording were played and discussed by the agent. *See, generally* Docs. 53 and 54; Gov't. Exhibits 1-21. The government also submitted a summary translation of conversations between Mr. Rafi and the CHS from October 6, 2021; October 7, 2021; and November 3, 2021. *See* Gov't. Exhibit 22.

The following timeline provides a visual aid of the facts and information from the evidence presented and the uncontested portions of the PSR.

## Pertinent Dates and Events

**2008 - 2013**
Translator for Afghan National Army and U.S. Department of Defense

**2009**
Assigned to Forward Operating Base Lightning

**Jan 15, 2014**
Enters United States as Lawful Permanent Resident

**Dec 8, 2017**
Posted video on Facebook of Dayee encouraging others to kill infidels and engage in jihad

**Dec 2017 - Jan 2018**
Aware of Mutawakil's arrest and Mutawakil's connection to ISIS

**Jan 24, 2018**
Requested telephone numbers for Mutawakil, Muslimyar, and Dayee via Facebook messenger

**2018**
Inquiries in Johnson County about militant and violent jihad

**Apr 2018**
Facebook messenger communications about Mutawakil's arrest

9





**Oct 11, 2019**
Deployed as contract linguist to Afghanistan

**Nov 10, 2019**
Caught sneaking back onto base in Kabul

**Jun 2020**
Facebook Messenger communications with Muslimyar

**Jul 14, 2020**
Personal travel to Kabul

**Oct 14, 2020**
Return travel from Kabul to Kansas City

**Nov 2020**
Muslimyar connected to ISIS-K attack at Kabul University

**Apr 10, 2021**
Personal travel to Kabul

**Jul 7, 2021**
Return travel from Kabul to Kansas City



## A.   Material Support of Terrorism

### 1.   *Designated Foreign Terrorist Organizations*

The Antiterrorism and Effective Death Penalty Act of 1996 added Section 219 to the Immigration and Nationality Act.   Section 219 authorizes the United States Secretary of State to designate organizations as foreign terrorist organizations when these three factors are met: (a) the organization is a foreign organization; (b) "the organization engages in terrorist activity … or terrorism … or retains the capability and intent to engage in terrorist activity or terrorism"; and (c) "the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States."

12

8 U.S.C. § 1189(a)(1).   The statute provides the process for such designations and defines the key terms with the designation process.

It is unlawful for persons in the United States or subject to the jurisdiction of the United States to knowingly provide material support or resources to a designated foreign terrorist organization.   *See* 18 U.S.C. § 2339B.   Material support or resources is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."   18 U.S.C. § 2339A(b)(1).

The testimony included references or discussions about the following designated foreign terrorist organizations.   Below is a summary of those designations and the authorities by which the designations were made.

**Islamic State of Iraq and the Levant (ISIL)/Islamic State of Iraq and al-Sham (ISIS)**

On or about October 15, 2004, the United States Secretary of State ("Secretary") designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under

Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist ("SDGT") under section 1(b) of Executive Order 13224.  On or about May 15, 2014, the Secretary amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (*i.e.*, "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  On September 21, 2015, the Secretary added the following aliases to the FTO and SDGT listings: Islamic State, ISIL, and ISIS.  On March 22, 2019, the Secretary added the following aliases to the FTO and SDGT listings: Amaq News Agency, Al Hayat Media Center, Al-Hayat Media Center, and Al Hayat.   To date, ISIS remains a designated FTO.

### ISIL Khorasan (ISIS-K)

On January 14, 2016, the Secretary designated ISIL Khorasan as an FTO under Section 219 of the INA and on January 21, 2016, as a SDGT under section 1(b) of Executive Order 13224.   The Secretary has also listed the following

14

aliases for ISIL Khorasan: The Islamic State of Iraq and ash-Sham—Khorasan Province, Islamic State's Khorasan Province, ISIS Wilayat Khorasan, ISIL's South Asian Branch, South Asian chapter of ISIL, The Islamic State of Iraq and Syria—Khorasan, Islamic State of Iraq and Levant in Khorasan Province, Islamic State Khurasan, ISISK, ISIS-K, and IS-Khorasan.   To date, ISIL Khorasan remains a designated FTO.

### Al Qa'ida (AQ)

On or about October 8, 1999, the Secretary designated al Qa'ida ("AQ"), also known as al Qaeda, as an FTO under Section 219 of the INA and as a SDGT entity under section 1(b) of Executive Order 13224.   The Secretary also added the following aliases to the FTO listing: "the Base," the Islamic Army, the World Islamic Front for Jihad Against Jews and Crusaders, the Islamic Army for the Liberation of the Holy Places, the Usama Bin Laden Network, the Usama Bin Laden Organization, Islamic Salvation Foundation, and The Group for the Preservation of the Holy Sites.   To date, AQ remains a designated FTO.

2.   *Specially Designated Global Terrorist*

In addition to designated FTO, an entity or person may be a Specially Designated Global Terrorist ("SDGT").   As noted in the summaries above regarding the designated FTOs, the SDGT status derives from Executive Order

13224. Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, Exec. Order No. 13224, 66 Fed. Reg. 49,079, 2001 WL 34773846 (Sept. 23, 2001). The Order was intended to be used as a powerful tool to eliminate funding of terrorist organizations and terrorist activity. Once designated under the Order, the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury takes steps to pursue assets of those designated. Those designated may have their assets blocked and U.S. persons are generally prohibited from conducting commerce with them.

## The Taliban

The other organization mentioned during the testimony was the Taliban, which is not a designated FTO, but it is an SDGT.

On or about July 2, 2002, the Secretary designated the Taliban as an SDGT under section 1(b) of Executive Order 13224. On or about July 2, 2002, OFAC designated the Taliban as a Specially Designated National ("SDN") under section 1(b) of Executive Order 13224, as amended by Executive Order 13886. OFAC also added the following aliases to the SDN listing: Islamic Movement of Taliban, Tahrike Islami'a Taliban, Taleban, Taliban Islamic Movement, Talibano Islami Tahrik. To date, the Taliban remains an SDGT

and an SDN.

(On July 2, 2002, the President issued Executive Order 13268, which amended Executive Order 13224 by adding The Taliban to the Annex of Executive Order 13224 with the various aliases included in the OFAC designation.   Termination of Emergency with Respect to the Taliban and Amendment of Executive Order 13224 of September 23, 2001, Exec. Order 13268, 67 Fed. Reg. 44751, 2002 WL 32817626 (July 2, 2002).)

3.   *Connection, Involvement, and Promotion of ISIS/ISIS-K*

By at least December 2017, Mr. Rafi was aware of ISIS/ISIS-K supporters and recruiters in Afghanistan.   Beginning at least by December 8, 2017, he promoted those supporters and recruiters by posting their videos on his Facebook account, starting with a video of Abduhl Zahir Dayee ("Dayee"). Additionally, by late 2017 to early 2018, Mr. Rafi knew about Abu Obaidullah Mutawakil ("Mutawakil") and his arrest by the Afghan National Directorate of Security ("NDS") for supporting and recruiting on behalf of the designated foreign terrorist organization ISIS/ISIS-K.

On January 24, 2018, Mr. Rafi asked his brother in Afghanistan to obtain telephone numbers for Dayee, Mutawakil, and Mobishir Muslimyar ("Muslimyar").   Approximately four months later, Mr. Rafi sent $2,000 via

Western Union to a brother in Afghanistan and directed at least $400 of that total to be given to Mutawakil. (From the post-arrest interview of Mr. Rafi, he actually funneled $700 to Mutawakil.) Approximately four months later in September 2018, ISIS-K terrorists carried out a suicide bombing at the Maiwand Wrestling Club in Kabul. Some of those terrorists were linked to Mutawakil as their recruiter.

On March 13, 2019, Mr. Rafi posted a video on his Facebook account opposing Mutawakil's recent arrest.

On June 7, 2019, Mr. Rafi posted a video on his Facebook account of Tahir Yuldashev, one of the founders of the Islamic Movement of Uzbekistan ("IMU"). (On September 25, 2000, the Secretary designated IMU as an FTO under Section 219 of the Immigration and Nationality Act. On September 25, 2001, the IMU was also designated as an SDGT under section 1(b) of Executive Order 13224. The Secretary has also listed the following aliases for the IMU: Islamic Movement of Turkestan, Islamic Party of Turkestan, Harakut Islamiyyah, Harakut ul Islamiyyah Uzbekistan, and Islamic Movement. To date, the IMU remains a designated FTO.) In 2015, the leaders of IMU pledged their allegiance to ISIS. The image of the video on Mr. Rafi's Facebook account included an ISIS flag.

18

On July 24, 2019, Mr. Rafi posted another video on his Facebook account opposing Muslimyar's arrest.    This particular video was reposted from Mutawakil's Facebook account.

As Mr. Rafi was preparing to travel to Afghanistan for his contract linguist position with the United States Department of Defense, he posted a video on his Facebook account in August 2019, which advocated "death to America." Although he contracted to work with the U.S. military, Mr. Rafi had voiced opposition to the U.S. military missions in Afghanistan as far back as 2009, according to a fellow linguist.    In 2019, Mr. Rafi told that fellow linguist that the FBI was investigating him because of his statements regarding jihad. Previously, Mr. Rafi told the fellow linguist that he graduated from a university founded by al Qa'ida.    The fellow linguist knew the reputation of the school as one that recruited people for terrorist activities and suicide attacks.    The fellow linguist was confused why Mr. Rafi sought the contract linguist position due to his strong opposition to the United States.    The other interpreters who worked with Mr. Rafi in Afghanistan in 2019 considered him extreme in his religious views and hatred of the United States.

In June 2020, before his personal return trip to Afghanistan in July 2020, Mr. Rafi communicated with Muslimyar via Facebook Messenger.    Muslimyar

was subsequently implicated in the ISIS/ISIS-K attack on Kabul University that occurred in November 2020.

On February 16, 2022, Mr. Rafi posted on Facebook one of Muslimyar's sermons that advocated fighting and martyrdom.

Within days of meeting the CHS via Facebook in early October 2022, Mr. Rafi told the CHS that his main goal when he traveled to Afghanistan in 2019 was to assist Muslimyar, who was in jail at the time.   Almost one month later, Mr. Rafi told the CHS that he even obtained access to prisoner documents when he traveled to Afghanistan in 2019.

B.   <u>False Statements</u>

The evidence is replete with Mr. Rafi making false statements, well beyond his charge of conviction.   He repeatedly lied to the agents during his post-arrest interview, he gave different reasons why he left the base in Afghanistan, he made false statements to the CHS, he submitted false information during his naturalization and citizenship process, and he was untruthful during the conversation with agents shortly before he purchased his airline tickets to leave the United States in October 2022.

1.   <i>Naturalization and Citizenship Process</i>

In completing the Form N-400 to apply for naturalization, Mr. Rafi made

a false statement in November 2018.

| 10. | Have you **EVER** been a member of, or in any way associated (either directly or indirectly) with: | | |
|---|---|---|---|
| | A. The Communist Party? | ☐ Yes | ☒ No |
| | B. Any other totalitarian party? | ☐ Yes | ☒ No |
| | C. A terrorist organization? | ☐ Yes | ☒ No |
| 11. | Have you **EVER** advocated (either directly or indirectly) the overthrow of any government by force or violence? | ☐ Yes | ☒ No |

As illustrated in the timeline above, by the time he answered those questions, Mr. Rafi had sent money to an ISIS recruiter, spoken with Mutawakil, and posted videos of Dayee encouraging others to kill infidels and participate in jihad.

As the naturalization process continued, immigration authorities interviewed Mr. Rafi in January 2019, reviewing the application Form N-400.

**10C. Have you EVER been a member of, or in any way associated (directly or indirectly) with: A terrorist organization?**

| Declared Response: | No | |
|---|---|---|
| Declared Date: | 11/27/2018 | |
| Question Asked During Interview: | Yes | |
| **Applicant Response(s) at Interview** | **Applicant testimony** | **Response Date** |
| None | None | None |

Mr. Rafi did not change his answer from what he gave on the written document, despite the additional opportunity to give truthful information.

In completing the Form N-445 and taking the naturalization oath on April 26, 2019, Mr. Rafi made a false statement.

5. Since your interview, have you joined, become associated, or connected with any organization in any way, including the Communist Party, a totalitarian organization, or terrorist group?    ☐ Yes ☐ No

From the interview on January 23, 2019, until he took the oath on April 26, 2019, Mr. Rafi posted a video on Facebook on March 13, 2019, regarding Mutawakil's arrest.    That activity demonstrates Mr. Rafi's continued connection with the ISIS terrorist group, which he again concealed.

### 2.    *Leaving Base in Afghanistan*

In executing his plan to leave the base in Afghanistan in November 2019, Mr. Rafi gave different reasons to military officials when seeking their permission to leave.    Before sneaking off base, Mr. Rafi had asked others how they left the base and solicited advice on how to do so.

One explanation was that he went to a bakery, but the surveillance camera footage showed Mr. Rafi returning to base from the opposite direction of the bakery.    Mr. Rafi claimed that he wanted to leave the base to visit friends, to visit his ill mother, to meet his fiancé, among the versions offered.

While one or all of these reasons to leave the base seem innocuous or unremarkable, the dangers lurking in and around the base were extensive. Those dangers were known to Mr. Rafi from his years of prior service as a linguist with the military.    Likewise, he would have known that offering differing false reasons to leave the base would generate heightened levels of

justified suspicion.

3.    *Conversations with CHS*

During cross-examination on June 27, 2025, the agent identified a host of false statements that Mr. Rafi made to the CHS.   The lies were about the following topics.

- Securing the release of ISIS recruiter Muslimyar.

- Travels to or within the United States before Mr. Rafi ever set foot in the United States, as well as other international travel not documented in his passport.

- Prior arrests by the FBI and the FBI orchestrating his firing from a job.

- Employment with Cerner.

- Employment as a computer specialist in Afghanistan.

Multiple times Mr. Rafi discussed with the CHS his travels to Afghanistan in 2019 and the purpose for which he secured the contract job to be there.   In most instances when he mentioned that trip, he reiterated a purpose and intent to assist Muslimyar.   Despite the many falsehoods surrounding his conversations with the CHS, the kernel of consistency focused on that purpose. Additionally, he claimed to have gained access to prisoner records and

documents that would have furthered that purpose and intent.

The other consistent aspect of Mr. Rafi's conversations with the CHS were contentions that Mutawakil and Muslimyar were arrested despite being innocent. That perspective aligns with Mr. Rafi's statements to agents that ISIS is not a harmful or terrorist organization.

### 4. *Ruse Interviews*

Two agents with the FBI's Joint Terrorism Task Force went to Mr. Rafi's residence on October 11, 2022, to question him about his brother in Afghanistan. During the conversation Mr. Rafi initially denied knowing anyone named Mutawakil. However, once the agents showed him a picture of Mutawakil, Mr. Rafi recognized Mutawakil and claimed Mutawakil had been wrongly arrested by the Afghan government. Mr. Rafi said he knew Mutawakil had been arrested for ISIS and terrorism-related activities in late 2017 to early 2018, and that Mutawakil was arrested for terrorism five times in one year. Mr. Rafi stated he had no idea why his brother would have had telephone numbers for Mutawakil.

Mr. Rafi denied ever speaking to Mutawakil.

Mr. Rafi denied ever sending money to Mutawakil.

Regarding Muslimyar, Mr. Rafi only acknowledged that he knew that

Mulimyar taught at a university.

The agents returned to speak with Mr. Rafi on October 12, 2022, telling him they sought to clarify some of the information gleaned the day before.    Mr. Rafi reiterated that he had never talked with Mutawakil.    He also denied ever sending money to Mutawakil.    Mr. Rafi explained his awareness of Mutawakil's multiple arrests for training ISIS and connections to terrorism was the reason he would not have interactions with Mutawakil.

Mr. Rafi told the agents that he was planning a multiple month trip to Afghanistan and would alert the agents once the travel plans were finalized.

Two days later on October 14, 2022, Mr. Rafi purchased airline tickets to travel from Kansas City to Dubai, with the departure on October 16, 2022, at 10:10 a.m.    Approximately thirteen hours before that scheduled departure from Kansas City, Mr. Rafi informed one of the agents of the flight.

### 5.    *Post-Arrest Interview*

In the interview following his arrest, Mr. Rafi repeatedly denied information until the agents showed him documents contrary to what he just told them.    In multiple instances, Mr. Rafi offered excuses or attempted to justify his actions.    The twenty clips from the interview that were played during the hearing on June 27, 2025, are representative examples, which are

25

summarized here.

Exhibit 2 – Mr. Rafi denied knowing Mutawakil or ever speaking with Mutawakil.    Mr. Rafi claimed to have only seen Mutawakil on television.

Exhibit 3 – Mr. Rafi denied ever providing money to Mutawakil.

Exhibit 4 – Mr. Rafi denied knowing Muslimyar but had also seen him teaching on television.    Mr. Rafi professed ignorance of Muslimyar ever being arrested in Afghanistan.    After more questions, Mr. Rafi said he learned from television that Muslimyar was arrested, but he did not know the reason for the arrest.

Exhibit 5 – Mr. Rafi denied knowing Dayee but had also seen him teaching on television.

Exhibit 6 – Mr. Rafi advocated that being part of ISIS is "a good thing."

Exhibit 7 – The agents showed Mr. Rafi messages from his Facebook account.    In those communications, Mr. Rafi asked his brother in Afghanistan to obtain telephone numbers for Dayee and Mutawakil.    Mr. Rafi justified his prior statement of not knowing either Dayee or Mutawakil by claiming to have never met either face-to-face.

Exhibit 8 – Mr. Rafi claimed he wanted Mutawakil's telephone number so he could confront Mutawakil about his Facebook speeches.    Even though

Mr. Rafi stated his brother did not know Dayee, he directed his brother to get Mutawakil's telephone number from Dayee.    Until the agents showed Mr. Rafi more Facebook messages, he claimed he never got Mutawakil's telephone number.

Exhibit 9 – Mr. Rafi finally admitted speaking with Mutawakil on the telephone using an international calling card.    Mr. Rafi said their conversation occurred after Mutawakil's ISIS-related arrest.

Exhibit 10 – Mr. Rafi acknowledged sending money to Mutawakil despite his brother advising against it.    Mr. Rafi reported his brother warned the money may not be used for water wells.

Exhibit 11 – Mr. Rafi finally admitted speaking with Muslimyar on the telephone in 2018.    Mr. Rafi acknowledged he actually knew Muslimyar was arrested in 2019 for ISIS connections.    During his personal trip to Afghanistan in Summer 2019, Mr. Rafi claimed to meet with Muslimyar during a visit to Kabul University.

Exhibit 12 – Mr. Rafi explained he sought the contract linguist position in part to help get some people out of jail.    Mr. Rafi admitted that he told people he took the contract linguist position to help get Muslimyar out of jail, but claimed he said that as an "excuse."

Exhibit 13 – Mr. Rafi acknowledged he posted videos on Facebook that promoted ISIS, but he suggested it would not influence others wrongly.

Exhibit 14 – Mr. Rafi acknowledged he sent $700 to Mutawakil, posted to Facebook videos of Mutawakil, and knew Mutawakil was arrested for ISIS connections.    Mr. Rafi justified his actions by claiming he was "brainwashed" by Mutawakil and others.

Exhibit 15 – Mr. Rafi offered his rationale for being "brainwashed."

Exhibit 16 – Mr. Rafi identified videos that he shared on Facebook that included an ISIS flag and one of the founding leaders of the Islamic Movement of Uzbekistan.

Exhibit 17 – Mr. Rafi admitted he failed to identify people on his SF-86 background questionnaire to whom he sent money in Afghanistan.    Mr. Rafi's excuse was that he forgot about these transactions when he completed the form. When asked directly why Mutawakil was left off the questionnaire, he claimed to have not sent money directly to Mutawakil so he did not need to be listed. Mr. Rafi acknowledged that he was hesitant to list Mutawakil because of Mutawakil's association with ISIS.    When discussing the Mutawakil video that inspired him, Mr. Rafi readily stated that video was about violent jihad and infidels – not about water wells.

Exhibit 18 – Mr. Rafi admitted he knew that Mutawakil had been arrested for ISIS activities, had talked with Mutawakil, and had sent Mutawakil money, but completed the background questionnaire as though none of that mattered. In explaining answers for his naturalization paperwork regarding Mutawakil, Mr. Rafi assumed no one knew about Mutawakil, that Mr. Rafi did not understand what terrorism meant, and Mr. Rafi did not know what ISIS did.

Exhibit 19 – Mr. Rafi claimed that he lied to others when he claimed to have gone to Afghanistan to help release Muslimyar or others arrested for ISIS activities.

Exhibit 20 – Mr. Rafi claimed ignorance about liking a video on his Facebook account that was against the U.S. military.   When shown the images from his Facebook account that he liked that video four days before his deployment as a contract linguist, Mr. Rafi had no explanation for the incompatibility other than being "brainwashed."

Exhibit 21 – Mr. Rafi revealed his knowledge that people in Afghanistan carried out suicide attacks after watching videos of ISIS teachers and recruiters like Mutawakil and Muslimyar.

Notably, during this interview Mr. Rafi told the agents he secured the linguist contract job to help his family and to help innocent people who had been

arrested in Afghanistan.   Mr. Rafi said he believed Mutawakil and Muslimyar were innocent people arrested in Afghanistan.   The dissonance remains that Mr. Rafi claimed he needed to correct Mutawakil's speeches as the justification for obtaining Mutawakil's phone number.   Yet, Mr. Rafi insisted that Mutawakil was "innocent" despite knowing Mutawakil and Muslimyar were connected to violent attacks perpetrated by ISIS members.

## III.   ARGUMENT

Based on the evidence presented and the uncontested facts in the PSR, the Court should overrule Mr. Rafi's objections to the PSR.   Because Mr. Rafi intended to promote a federal crime of terrorism when he made false statements to the Department of Defense to secure the contract linguist position, the Terrorism Enhancement of U.S.S.G. § 3A1.4 applies.

Due to Mr. Rafi's objection, the government must prove the supporting facts of the Terrorism Enhancement by a preponderance of evidence.   *See United States v. Martinez*, 82 F.4th 994, 1001 (10th Cir. 2023); *United States v. Allen*, 364 F.Supp.3d 1234, 1245 (D. Kan. 2019).

A "court's application of the Sentencing Guidelines [are reviewed] for abuse of discretion."   *United States v. Rodriguez*, 945 F.3d 1245, 1248 (10th Cir. 2019).   "In applying that standard, we review questions of law de novo and

factual findings for clear error." *Id.* at 1249.

"In general, factual findings at sentencing must be supported by a preponderance of the evidence. *United States v. Robertson*, 946 F.3d 1168, 1171 (10th Cir. 2020)." *United States v. Stein*, 985 F.3d 1254, 1266 (10th Cir. 2021).

> A.    Terrorism Enhancement

U.S.S.G. § 3A1.4(a) provides a twelve-level enhancement "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." However, if the resulting offense level is less than level 32, the Court is directed to increase the offense level to level 32. In this case, that makes the enhancement 26 levels to reach level 32.

Section 3A1.4 establishes two independent basis for applying the enhancement. The first, not applicable here, applies if the offense of conviction or relevant conduct included a federal crime of terrorism. The second, which is the basis for the Government's assertion for the enhancement, applies "if the offense . . . was intended to promote a federal crime of terrorism." *United States v. Fidse*, 862 F.3d 516, 522 (5th Cir. 2017). "In such cases, 'the terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation. Rather, it is the defendant's *purpose* that is relevant, and if that purpose is to

promote a terrorist crime, the enhancement is triggered." *Id.* (quoting *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (emphasis in original).

"However, '[t]he terrorism enhancement applies so long as [defendants'] conduct was 'calculated . . . to retaliate against government conduct,' even if it was also calculated to accomplish other goals simultaneously.' *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (quoting 18 U.S.C. § 2332b(g)(5)(A)); *see also United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010)." *Stein*, 985 F.3d at 1267.

In other words, to establish the enhancement, the Government must prove Mr. Rafi had, as one purpose of his commission of the offense of making a false statement, an intent to promote a federal crime of terrorism. Yet, it is not necessary that Mr. Rafi "completed, attempted, or conspired to commit the [federal] crime [of terrorism]." *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001).

1.   *Federal Crime of Terrorism*

The Guidelines define "federal crime of terrorism" by reference to 18 U.S.C. § 2332(b)(g)(5), which defines federal crime of terrorism as an offense that "is calculated to influence or affect the conduct of government by

intimidation or coercion, or to retaliate against government conduct" and is a violation of certain enumerated statutes, including providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B.

In other words, "a federal crime of terrorism," consists of two elements: (1) the commission of one of a list of specified felonies; and (2) that the underlying felony was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Chandia*, 514 F.3d 365, 375-76 (4th Cir. 2008).

Mr. Rafi pled guilty to making a false statement in violation of 18 U.S.C. § 1001, which is not one of the enumerated provisions in § 2332b(g)(5). Thus, the government must establish by a preponderance of the evidence that the offense of making a false statement involved, or was intended to promote, a federal crime of terrorism. As such, the government must prove the offense was "calculated" to influence or affect the conduct of the government by intimidation or coercion or was in retaliation against government conduct. The use of the word "calculated" in the definition of federal crime of terrorism, imposes something akin to a specific-intent element. *See United States v. Ansberry*, 976 F.3d 1108, 1127 (10th Cir. 2020).

The second prong of the definition of "federal crime of terrorism" requires

the Court to find a violation of an offense enumerated under § 2332b(g)(5).    The enumerated crime, as alleged by the government here, is material support of terrorism in violation of § 2339B.    That violation requires the government to prove the defendant (1) knowingly provided material support or resources to a foreign terrorist organization and (2) did so knowing the organization was either designated as a terrorist organization or was engaged in terrorism or terrorist activity.    *See Pattern Crim. Jury Instr. 11th Cir*. OI O91.2 (2024).    Material support or resources includes property, service, or money.    *Id*.

But, to qualify for the U.S.S.G. §3A1.4(a) enhancement, it is not enough for the government to prove by a preponderance of evidence a material support of terrorism violation.    The government must also prove Mr. Rafi had the requisite intent to satisfy the definition of federal crime of terrorism, which is more than the intent necessary to establish a violation of the material support statute.    *See United States v. Alhaggagi*, 978 F.3d 693, 699 (9th Cir. 2020).    "It is possible for a defendant to provide material support to a terrorist group in violation of 18 U.S.C. § 2339B(a)(1) without intending that the support or resources would influence, affect, or retaliate against government conduct to satisfy the first prong of the definition of federal crime of terrorism."    *Id*.

Congress created this distinction in order to punish certain dangerous terrorists more severely than persons who committed

34

non-violent crimes. *See* [*United States v.*] *Tankersley*, 537 F.3d [1100] at 1113 [(9th Cir. 2008)]. Thus, to warrant a substantial increase in punishment pursuant to the terrorism enhancement, a defendant must have the requisite intent necessary to satisfy the definition of federal crime of terrorism, beyond the intent required to establish a violation of the material support statute.

*Id.*

In cases involving violent acts of terrorism, specific intent is relatively easy to identify, either from the statements or admissions of the defendant or the nature of the offense. But, where the conduct underlying the conviction does not involve violent terrorist acts, as is true in many material support cases, those "acts cannot, standing alone, support application of the terrorism enhancement." [*United States v.*] *Chandia I*, 514 F.3d [365] at 376 [4th Cir. 2008]. In such cases, evidence beyond the facts underlying the offense conduct must reflect that the defendant had the enhancement's requisite intent.

*Id.* at 701-02.

## 2. *Material Support of Terrorism*

As explained during the testimony on June 27, 2025, Mr. Rafi's sending of at least $400 to Mutawakil in May 2018, qualified as material support of a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B. However, that act of material support is not directly connected to Mr. Rafi's false statement to the Department of Defense in August 2019.

The material support intertwined with Mr. Rafi's crime of conviction is offering himself to further the goals of ISIS/ISIS-K by helping their recruiters

get released from imprisonment, or attempting or conspiring to do so.   Mr. Rafi's false statements were made to secure the contract linguist position so that he could travel to Afghanistan where he "intended to promote" the terrorist activities of ISIS/ISIS-K.   If the crime of conviction "involved" or "intended to promote" the material support of terrorism, then the enhancement applies. *See Graham*, 275 F.3d at 517.   The drafters of the Guidelines "cast a broader net" for the enhancement to apply in cases when a crime not listed in 18 U.S.C. § 2332b(g)(5)(B) is committed.   *Mandhai*, 375 F.3d at 1247-48.

Mr. Rafi's purpose and intent to be employed as a contract linguist in Afghanistan was to aid and assist ISIS/ISIS-K.   That aiding and assisting would be through efforts to help release Muslimyar from custody.   Mr. Rafi believed that he could utilize the liberty granted to him as a linguist with a security clearance to gain access to locations, documents, files, or materials that would lead to Muslimyar's freedom or enable Mr. Rafi to assist with such. Alternatively, if Mr. Rafi could not free the "innocent" Muslimyar, then he intended to do so on behalf of other "innocent" ISIS recruiters or fighters. Offering himself for the cause of ISIS or utilizing his special skills and unique placement as a linguist with a security clearance sufficiently qualifies as "material support."

3.     *Calculated to Influence or Affect*

"A defendant may have mixed or multiple intents.    But if one of them is to influence, affect, or retaliate against government conduct, the enhancement applies."    *United States v. Alowemer*, 96 F.4th 386, 389 (3d Cir. 2024). "Supporting ISIS . . . is some evidence that [the defendant's] conduct was calculated to influence or affect the conduct of the United States because ISIS's terrorist acts are intended to intimidate or coerce the United States."    *United States v. Khan*, 938 F.3d 713, 719 (5th Cir. 2019).

"Calculation is concerned with the object that the actor seeks to achieve through planning or contrivance."    *United States v. Ali*, 799 F.3d 1008, 1031 (8th Cir. 2015) quoting *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014). "[T]his standard does not focus on the defendant but on his 'offense,' asking whether it was calculated, i.e., planned – for whatever reason or motive – to achieve the stated object."    *Ali*, 799 F.3d at 1031 (quotation omitted).

"The court can find [specific] intent based on circumstantial evidence and reasonable inferences from the facts presented."    *United States v. Wright*, 747 F.3d 399, 419 (6th Cir.), *cert. denied*, 574 U.S. 866 (2014).

Mr. Rafi's disdain or hatred of the United States, the United States government, and/or the United States military supports the conclusion that a

goal or purpose to obtain the contract linguist job was to assist Muslimyar or other ISIS arrestees secure freedom to carry on their terrorist activities against Afghanistan and/or the United States. Mr. Rafi's statements and actions against the United States are not as strong as those by the defendant in *Alowemer*, but they are analogous. *See Alowemer*, 96 F.4th at 389.

Mr. Rafi knew of ISIS's utilization of suicide attacks against the Afghanistan government or to disrupt the civilian efforts of that government. He also knew that ISIS sought to fight the U.S. military through whatever means were available. He specifically knew that Mutawakil and Muslimyar were connected to deadly ISIS attacks intended to influence or affect government conduct. Therefore, his assistance to an ISIS recruiter like Muslimyar or another "wrongly" imprisoned ISIS members was solely so the terrorist organization could continue or increase its resistance against the government of Afghanistan or the U.S. military.

Mr. Rafi "planned his offense – whatever his reasons or motivations – with the purpose of influencing or affecting government conduct." *Mohamed*, 757 F.3d at 760.

B.     Supervised Release Condition

With his final objection, Mr. Rafi challenges being required to contribute to the costs of the monitoring.

The discretion afforded courts in 18 U.S.C. § 3583(d) should allow it to order payment of such costs to the extent the defendant's financial ability is sufficient to do so.

IV.     CONCLUSION

For the foregoing reasons, the government respectfully moves this Court to overrule Mr. Rafi's objections to the PSR and find the applicable guidelines range to be 60 months.


Respectfully submitted,

RYAN A. KRIEGSHAUSER
United States Attorney
District of Kansas


By:     s/Scott C. Rask
        Scott C. Rask
        Assistant United States Attorney
        500 State Avenue, Suite 360
        Kansas City, Kansas 66101
        (913) 551-6730
        (913) 551-6541 (fax)
        Scott.Rask@usdoj.gov
        Kan. S. Ct. No. 15643

By:   s/D. Christopher Oakley
      D. Christopher Oakley
      Assistant United States Attorney
      500 State Avenue, Suite 360
      Kansas City, Kansas 66101
      (913) 551-6730
      (913) 551-6541 (fax)
      Chris.Oakley@usdoj.gov
      Kan. S. Ct. No. 19248

## CERTIFICATE OF SERVICE

I certify that on August 15, 2025, I electronically filed this Sentencing Memorandum with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to those attorneys who have entered their appearance in the matter.

By:   s/Scott C. Rask
      Scott C. Rask, #15643
      Assistant United States Attorney

40