## In the United States District Court
## for the District of Kansas
## (Kansas City Docket)

**United States of America**,
                    Plaintiff,

v.                                                    Case No. 22-20055-DDC

**Mohammad Rafi**
                    Defendant.

### Sentencing Memorandum Regarding PSR Objections

This Court should decline to apply the terrorism enhancement without even reaching the merits, as (1) the government has waived the enhancement by insufficiently briefing it (pages 2-3); (2) the enhancement cannot be applied absent a jury finding beyond a reasonable doubt (page 4, for preservation only); (3) the enhancement contravenes a Congressional directive to apply it "only" to Federal crimes of terrorism (pages 5-6); and (4) the enhancement cannot be based on challenged PSR paragraphs (page 7).

If this Court reaches the merits, it should find the enhancement neither factually nor legally justified (pages 8-28). At most (*arguendo*), Mr. Rafi made his false statement intending to engage in "independent advocacy"—an action "not covered" by the material-support statute (pages 23-26). *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 31-32 (2010). And his advocacy was not calculated to influence government *by intimidation or coercion* (pages 26-29).

## 1. The government has waived the enhancement by insufficiently briefing it.

This Court has recognized that a litigant may waive a claim by insufficiently briefing it. *U.S. EEOC v. KCKCC*, No. 23-202-DDC-ADM, 2024 WL 3665290, at *6 (D. Kan. Aug. 6, 2024) (declining "to comb the Code of Federal Regulations to find and make" litigant's argument where litigant failed to "share[] its reasoning" or "show its work"; finding argument waived). This Court should deem the terrorism enhancement waived because the government's sentencing memorandum is factually and legally insufficient.

As for the facts, the government tells the Court to "see generally" the transcripts and exhibits. Doc. 56 at 8. The government then asserts a host of facts in a multi-page chronology and throughout its memorandum without any citations to the transcripts, exhibits, or PSR.[1] The government's failure to tie its factual assertions to the record makes it unnecessarily difficult for Mr. Rafi to respond, and for this Court to rule. *See United States v. Ibarra-Diaz*, 805 F.3d 908, 918 n.4 (10th Cir. 2015) (Court would "not hunt through the record" to confirm appellant's non-sourced descriptions).

As for the law, the government perfunctorily claims that Mr. Rafi's "[o]ffering himself" to help free arrested ISIS-K recruiters "sufficiently

---

[1] With one exception: The government offers summaries of Mr. Rafi's 4-hour, un-transcribed, post-arrest interview (Exh. 1) with citations to short, hard-to-understand, contextless video-clip exhibits (Exhs. 2-20). Doc. 56 at 25-29.

qualifies as 'material support.'" Doc. 56 at 35-36. Whether or not Mr. Rafi intended to promote a "material support" offense is key to the government's terrorism-enhancement argument. But nowhere in this section does the government define "material support" or explain how it thinks the facts here satisfy the controlling legal test. The government offers statutory and instructional definitions of "material support" elsewhere, Doc. 56 at 12, 34, but never says which type of support it thinks Mr. Rafi intended to provide. These bare definitions offer little illumination on the controlling test, are not repeated or applied in the relevant argument section, and do not help the reader understand how the government thinks the facts here satisfy the controlling test.

The government's summary claim of material support makes it unnecessarily difficult for Mr. Rafi to understand, much less respond to, the government's legal argument, and unnecessarily difficult for this Court to rule. *See Defenders of Wildlife v. United States Forest Service*, 94 F.4th 1210, 1227 n.10 (10th Cir. 2024) (declining to consider perfunctory claim that party "fail[ed] to frame and develop"); *Day v. SkyWest Airlines*, 45 F.4th 1181, 1191-92 (10th Cir. 2022) (declining to consider claim where party devoted "little space" to the issue and issue involved a "somewhat Byzantine area of the law"). The government's briefing of this important issue is insufficient, and this Court should deem the terrorism enhancement waived.

**2. This Court may not adopt the enhancement absent notice in the indictment and a jury finding beyond a reasonable doubt that Mr. Rafi intended for his false statement to promote a federal crime of terrorism** *(argument made for preservation purposes only).*

The terrorism enhancement would increase Mr. Rafi's advisory guidelines range from 0–6 months of prison in Zone A (with probation eligible) to a range of 151–188 months of prison in Zone D (with no probation eligible). While this range will be capped at 60 months because of the statutory maximum, that 60 months is still *ten times* the high end of what would otherwise be Mr. Rafi's guidelines range—that is, the "starting point and . . . initial benchmark" (the "anchor" and "lodestar") of Mr. Rafi's sentencing. *Molina-Martinez v. United States*, 578 U.S. 189, 198-200 (2016).

Given the dramatic nature of the terrorism enhancement, the Fifth and Sixth Amendments require that the facts alleged to support the enhancement be charged in the indictment, and that any enhancement-related findings be made by a jury beyond a reasonable doubt. *Cf. Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Jones v. United States*, 526 U.S. 227 (1999); *Alleyne v. United States*, 570 U.S. 99 (2013).

The Tenth Circuit disagrees. *See, e.g., United States v. Dermen*, 143 F.4th 1148, 1223-24 (10th Cir. 2025). We concede that this issue is foreclosed by Tenth Circuit authority, but we ask this Court to rule on the issue in order to preserve it for further review.

### 3. Applying the enhancement to a non-terrorism crime contravenes a 1996 Congressional directive to amend the enhancement so that it "only applies to Federal crimes of terrorism."

Mr. Rafi inadvertently overlooked this argument in his objections to the PSR. However, this Court "may, for good cause, allow a party to make a new objection at any time before sentence is imposed." Fed. R. Crim. P. 32(i)(1)(D). Good cause exists here, where the objection is to an enhancement that Mr. Rafi has otherwise challenged; the objection is straightforward, purely legal, and requires no additional evidence to resolve; and there is still ample time for the government to respond. *See United States v. Angeles-Mendoza*, 407 F.3d 742, 749 n.11 (5th Cir. 2005) (Rule 32 "good cause" inquiry considers whether allowing the objection would have adverse effects), *cited with approval by United States v. Jarvi*, 537 F.3d 1256, 1263 (10th Cir. 2008).

The terrorism enhancement previously applied if the offense was "a felony that involved, or was intended to promote, *international terrorism*." USSG § 3A1.4 (1995) (emphasis added). In 1996, Congress directed the Sentencing Commission to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code." Pub. L. 104-132, § 730, 110 Stat. 1214, 1303. This plain language directed the Commission to broaden the enhancement (it would no longer be limited to crimes involving *international* terrorism), but to ameliorate that broadening

5

somewhat by amending the enhancement to "*only*" apply "to Federal crimes of terrorism," i.e., not to non-terrorism crimes like making a false statement.

The Commission responded by replacing "international terrorism" with "a federal crime of terrorism" in the guideline. USSG app. C, amend. 539 (1997). But the Commission retained that part of the guideline applying the enhancement to felonies that did not "involve," but were merely "intended to promote," a federal crime of terrorism. *Id.* This retention violated Congress's plain directive for the enhancement to "*only*" apply to "Federal crimes of terrorism." If a guideline "is at odds with [Congress's] plain language, it must give way." *United States v. LaBonte*, 520 U.S. 751, 757 (1997). The terrorism enhancement—as applied to non-terrorism crimes—must give way here.

Even if the directive's language is not plain, "that would only provide another reason for the same result": the rule of lenity, which requires a reading that will "avoid an increase in the penalty prescribed for the offense." *United States v. Manatau*, 647 F.3d 1048, 1055 (10th Cir. 2011).[2] This Court should read the directive with an eye towards lenity, and decline to apply the enhancement here, where the crime is *not* a "Federal crime[] of terrorism."

---

[2] Two circuits have deemed the directive "admittedly ambiguous" and therefore deferred to the Commission's reading of it. *United States v. Hasson*, 26 F.4th 610, 623 (4th Cir. 2022); *United States v. Mohammed*, 89 F.4th 158, 163 (D.C. Cir. 2023). But these decisions predated *Loper-Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (courts, not agencies, have final authority to interpret ambiguous statutes), and neither considered the rule of lenity.

**4. This Court should either sustain *all* of Mr. Rafi's PSR objections or ignore the government's claim to have proved the allegations in the challenged paragraphs.**

Mr. Rafi has objected to the following paragraphs of the PSR:

| Objection 1 | ¶ 12 | Rafi did not answer a question falsely in his linguist application on June 17, 2019 |
|---|---|---|
| Objection 2 | ¶ 13 | Rafi did not answer questions falsely on naturalization forms on November 12, 2018 and April 26, 2019 |
| Objection 3 | ¶ 14 | Rafi's answers to the above questions are not proven false based on his Facebook account or his statements |
| Objection 4 | ¶ 21 | Rafi did not tell the CHS that the "only" reason he got the linguist position was to help free Muslimyar or others |
| Objection 5 | ¶ 34 | The terrorism enhancement does not apply |
| Objection 6 | ¶ 38 ¶ 40 ¶ 41 | Absent the terrorism enhancement, Rafi should receive a 2-level reduction for 0-point offender, and a 2-level reduction for acceptance of responsibility, for a total offense level of 2 |
| Objection 7 | ¶ 107 | There is no statutory authority for requiring Rafi to pay for computer monitoring/management costs |

The government accurately states that we agree that Objections 1, 2, and 3 do not impact the guidelines and need not be decided. Doc. 56 at 6. But the government also argues that it has proved the allegations challenged in Objections 2 and 3, and that this proof supports a finding that Rafi intended to promote terrorism. Doc. 56 at 20-22. The Court should either decide (and sustain) Objections 1, 2, and 3 or ignore the government's claim to have proved the allegations in the challenged paragraphs. For efficiency's sake, we rely on (and won't reargue) Objections 1, 2, 3, and 7 as set out in the PSR.

**5. The government has failed to produce sufficient evidence or a cognizable legal theory to support the enhancement.**

Mr. Rafi is a faithful Muslim, a naturalized U.S. citizen who supports his adoptive country, Doc. 53 at 50, and a generous helper to local Afghan refugees, Doc. 49, PSR at ¶ 66. He is also a poseur who fancies himself a worldly scholar and curator of news and events in Afghanistan and spins self-aggrandizing tales on impulse. But he is not a promoter of terrorism.

The government asks this Court to find that Mr. Rafi made his false statements intending to use his security clearance to help free Muslimyar or others so that they could "carry on their terrorist activities against Afghanistan and/or the United States." Doc. 56 at 37-38. The government argues that these factual findings are supported by evidence of Mr. Rafi's **pre-deployment** statements and Facebook activity, Doc. 56 at 9-12, 17-20; his **deployment** conduct of leaving the base in Afghanistan without permission and saying "extremist" things, Doc. 56 at 19, 22; and his years-later **post-deployment** statements, Doc. 56 at 23-30.

As we show below, (A) this alleged evidence is overstated and insufficient to prove that Mr. Rafi made his false statement intending to help free Muslimyar or others from prison. And even if this evidence proved an intent to help free Muslimyar or others, (B) the government has not articulated a

cognizable legal theory why such an intent would qualify as the intent to provide "material support" necessary to justify the terrorism enhancement.

### A. The government has not proved that Mr. Rafi made his false statement in order to help free Muslimyar or others from prison

The following is a brief chronology of important anchor events, which will be described in more context in the narrative below.

| Date | Event | Source |
|---|---|---|
| 2008–2013 | Mr. Rafi works in Afghanistan as a local linguist for the Afghan National Army as well as for the U.S. DOD | Doc. 49, PSR ¶¶ 51, 69 |
| May 2018 | Mr. Rafi sends money to Mutawakil for water wells | Doc. 53 at 13-14 |
| April 2019 | Mr. Rafi becomes a naturalized U.S. citizen | Doc. 49, PSR ¶ 8 |
| June 2019 | Mr. Rafi applies for a linguist job with a subcontractor of the U.S. DOD | Doc. 53 at 16 |
| July 2019 | News articles report Muslimyar's arrest | Exhs. 405, 406, 407, 408, 409 |
| July 24, 2019 | Mr. Rafi reposts a comment about Muslimyar's arrest; according to Agent Blay, this is the "first time" Mr. Rafi posted about Muslimyar's arrest (and the only time Blay references) | Exh. 410; Doc. 53 at 77 |
| August 12, 2019 | Mr. Rafi falsely states on a security-clearance application that he has not ever associated with anyone involved in activities to further terrorism | Doc. 43 at 14-15 |
| October 11, 2019 | Mr. Rafi is deployed to Afghanistan as a contract linguist for a subcontractor of the U.S. Department of Defense | Doc. 49, PSR ¶ 67; Doc. 53 at 48-49 |

| Date | Event | Source |
|------|-------|--------|
| November 2019 | About a month after being deployed, Mr. Rafi is terminated for leaving base without permission, and sent back to the U.S. | Doc. 49, PSR ¶ 49; Doc. 53 at 50 |
| October 2021–February 2022 | Mr. Rafi makes fanciful and exaggerated claims to the CHS | Doc. 53 at 53-57; Exh. 22 |
| October 2022 | The FBI conducts "ruse" and post-arrest interviews of Mr. Rafi | Doc. 53 at 19-38 |

### (1)     Pre-deployment: Mr. Rafi did not seek out the linguist position in order to free Muslimyar

a.  More than two years *after* Mr. Rafi's deployment ended, Mr. Rafi told the CHS that his "main goal" in obtaining the position as an IT specialist "was to help facilitate the release of Mobishir Muslimyar." Doc. 53 at 18; Exh. 22 at 1. But Mr. Rafi also told the CHS that he had in fact facilitated the release of Muslimyar—one of many outlandish claims he made to the CHS that Agent Blay agreed were false. Doc. 53 at 54-57; Exh. 22 *passim*. Mr. Rafi's self-aggrandizing statements to the CHS in 2021 are unreliable and do not prove his intent when he first applied for a linguist position (not an IT position) in 2019.

Additionally, the contemporaneous (pre-deployment) evidence suggests that, at the time Mr. Rafi first applied for the linguist position, Muslimyar was *not* detained. Agent Blay testified that Mr. Rafi began the application process in **June of 2019**. Doc. 53 at 16. According to news articles admitted at the hearing, Muslimyar was arrested in **July of 2019**. Exh. 405 at 2 ("In

July 2019, [NDS] arrested four suspects"), 3 ("The NDS arrested Mubasher Muslimyar . . . in July"); Exh. 406 at 1 ("the NDS stated on 7 July that the Special Forces arrested four members of the 'Daesh' . . . terrorist group," including Mobashir Muslimyar); Exh. 407 (article dated July 9 reporting arrest); Exh. 408 (article search result excerpt: "Three Islamic State (IS) 'recruiters' including a university lecturer identified as Mubasher Muslimyar, were arrested by [NDS] in Kabul city of Kabul Province, reports Khaama Press on July 7"); Exh. 409 (article dated July 11 reporting arrest).

Agent Blay testified that at some point during his investigation, he "identified several articles in January, February and March of 2019 that detailed the arrest of Mobishir Muslimyar." Doc. 53 at 15. But he also agreed that the articles admitted as exhibits stated that Muslimyar was arrested in July of 2019. Doc. 53 at 76. Finally, Agent Blay admitted that in a sworn affidavit he stated that "in July 2019, according to the Afghan National Directorate of Security, NDS, Muslimyar was arrested on charges of recruiting students for ISIS in order to stage a deadly attack." Doc. 53 at 78. And the government did not submit any articles describing an arrest on an earlier date. Neither did the government offer any other evidence that Muslimyar was detained at the time Mr. Rafi began the linguist application process.

b.  Even if Muslimyar had been arrested before Mr. Rafi first applied for

the linguist position in **June of 2019**, Doc. 53 at 16, Agent Blay admitted

that the government had no evidence that Mr. Rafi knew Muslimyar was

detained until **July 24, 2019**, when he reposted a comment about it, Doc. 53

at 77 (Blay testifying that it was "fair" to say "we don't know . . . what if any

of those articles Mr. Rafi saw on the Internet" and that July of 2019 was "the

first time he posted about the arrest"). We agree that this **July 24, 2019**

posting shows that Mr. Rafi knew of Muslimyar's arrest at the time he made

his false statement on **August 12, 2019**. But, again, Mr. Rafi had begun the

linguist application process a month before posting about Muslimyar's arrest.

c.  Mr. Rafi had many reasons wholly unrelated to Muslimyar to apply for

the linguist position. The job was similar to work he had previously

performed in Afghanistan as a local linguist for the Afghan National Army

and the U.S. Department of Defense, for which he had received a dozen

certificates of appreciation and commendation. Doc. 49, PSR ¶¶ 51, 69. While

he had just become a naturalized US citizen on April 26, 2019, Doc. 49, PSR

§ 52, Mr. Rafi still had family in Afghanistan—including his parents, at least

some siblings, and his fiancée. Doc. 53 at 47; Doc. 54 at 18-19; Doc. 49, PSR

§ 12; Exh. 401. The job presented many opportunities for a young man

seeking to get married and build a new life in his new country, and thus, as

Mr. Rafi later explained to Agent Blay, he wanted "to go over there to help

with the U.S. Army, the Afghan Army also, to make money, for my family support them, and I would have planned to buy a house if I would be able to work more, to make some extra cash there, because if you overseas you save more money than in the U.S." Exh. 12 (video clip 11).

d. The government makes much ado about Mr. Rafi's Facebook activity, Doc. 56 at 17-20, without having offered into evidence any actual Facebook exhibits (posts, reposts, messages, videos, etc.). Neither did the government present any evidence that Mr. Rafi ever messaged anyone or posted anything stating a desire or intent to help free Muslimyar or others, or even mentioning the linguist position.

Mr. Rafi does not contest the PSR's statement that he reposted videos "opposing the U.S. military which came from a known pro-ISIS platform." Doc. 49, PSR at ¶ 17. Beyond that general report, Agent Blay described one video "making statements about how the U.S. Army and the Afghan Army were bad—were doing bad things"; and described another as "a video of a young child, and the description in the video talked—mentioned something about jihad or infidel, something about that nature." Doc. 53 at 36. But of course critiquing one's government and mentioning "something about" hot-button words falls far short of declaring an intent to free Muslimyar or others or to provide material support to terrorists (see below discussion at pages 23-26 of what acts are *not* covered by the material-support statute).

13

Mr. Rafi was "pretty prolific on Facebook, posting a lot of comments, likes, and reposts between late 2017 and September 2021. Doc. 53 at 41. Agent Daniel could not say what percentage of his posts appeared supportive of ISIS. Doc. 54 at 40. Agent Daniel characterized at least some of the posts as "supportive of ISIS" because "the individuals that Mr. Rafi was reposting or posting were following the ISIS ideological beliefs." Doc. 54 at 34. But Agent Daniel was careful to couch any conclusions he drew from that characterization as mere possibilities, stating that, if Mr. Rafi was "consuming and/or reposting materials that are supportive of ISIS," he (Mr. Rafi) "*may* have ideological *leanings towards* that type of belief and ideolog[y] to include its aversion to the west, the western ideology, and to the United States." Doc. 54 at 35 (emphases added). That a person "may" have "ideological leanings towards" an "aversion" to western ideology falls far short of proving that the person intends to provide material support to terrorists.

Neither does the Facebook evidence of Mr. Rafi's **May 2018** donation to Mutawakil prove anything about his intent when he sought the linguist position over a year later in **June of 2019**. Doc. 53 at 13-14. Agent Blay did not dispute that Mr. Rafi sent money to Mukawakil through his brother on just a single occasion, and that the money was intended for water wells. Doc. 53 at 14; Doc. 54 at 18. This was during a time when only 42 percent of Afghans had access to safe drinking water. Exh. 402. Agent Blay recalled at

14

least one Facebook discussion between Mr. Rafi and his brother about an "uncle's placement of a water well, where that should be and how much that's going to cost." Doc. 53 at 60. And the government does not disagree that the Facebook records showed Mr. Rafi and his brother having "*many* discussions . . . about the logistics and costs of water wells in the area." Doc. 49, PSR at ¶ 18 n.2 (emphasis added). Indeed, notwithstanding the rest of his fanciful tales and obfuscations to Agent Blay, Mr. Rafi consistently told Agent Blay that he had sent that money to Mutawakil "for water wells." Doc. 53 at 70.

The government alleges with no citations to the record that Mr. Rafi posted a video on Facebook "which advocated 'death to America'" in August 2019—the same month he made his false statement. Doc. 56 at 10, 19. First, we object to consideration of this allegation because it appears to be based on hearsay not shown to be reliable: Agent Blay testified that Karim "identified" to the FBI that a "death to America" video had been reposted to Mr. Rafi's Facebook account. Doc. 53 at 10-11; Doc. 54 at 5. But Agent Blay did not claim to have seen this video himself or otherwise confirm that this report was true; neither has the government submitted any such video into evidence. Doc. 53 at 10-11; Doc. 54 at 5. Second, Agent Blay testified that the alleged video was a *repost*, not an original post. Doc. 53 at 10-11. Third, the alleged video was not of Mr. Rafi advocating "death to America," but of unidentified people in a crowd chanting "death to America." Doc. 53 at 10-11.

15

Fourth, Agent Blay's testimony about Karim's allegation offers no context—no information about whether Mr. Rafi commented on the video or reposted it alongside any additional posts—that would inform the Court about Mr. Rafi's intent in reposting the video, if in fact he reposted it. Doc. 53 at 10-11; Doc. 54 at 5. This allegation lacks credibility, confirmation, or context and falls far short of proving an intent to provide material support to terrorists.

  e.  Finally, the government asks this Court to find that in 2018, a year before his deployment, Mr. Rafi made "inquiries in Johnson County about militant and violent jihad." Doc. 56 at 9. Agent Blay testified that a person named Moben Mirza reported to the FBI that Mr. Rafi was "having conversations" with a local Imam about "the violent or militant aspect of jihad." Doc. 53 at 10. But when Agent Blay interviewed the Imam, the Imam said only that Mr. Rafi had asked him "what jihad means," and that the Imam had explained to him that "jihad means to be good," "[t]o have good knowledge," "[t]o help one's parents," and "[t]o take care of one's family." Doc. 53 at 52-53. This conversation falls far short of proving that Mr. Rafi intended to help free Muslimyar or provide material support to terrorists when he made his false statement in 2019.

**(2)    Deployment: Mr. Rafi raised no counterintelligence concerns during his deployment**

a.  Mr. Rafi was deployed to Afghanistan on October 11, 2019 as a contract linguist for a subcontractor of the U.S. Department of Defense; his job was to "translate reports." Doc. 49, PSR ¶ 19; Doc. 53 at 48-49. One of his supervisors, Captain Haplin, later told the FBI that "Mr. Rafi did not display any overt indicators of CI [counterintelligence] concerns." Doc. 53 at 46-49. Another supervisor, NCO Megan Reufa, found Mr. Rafi to be "a nice individual" who "talked about family a lot," was "getting married soon," and "work[ed] well with others." Doc. 53 at 49-50.

b.  The government alleges with no citations to the record that during his deployment Mr. Rafi "execut[ed]" a "plan to leave the base in Afghanistan in November 2019" after "ask[ing] others how they left the base and solicit[ing] advice on how to do so." Doc. 56 at 22. The government further alleges that Mr. Rafi claimed that he went to a bakery, but that video footage suggested otherwise. Doc. 56 at 22. Mr. Rafi does not dispute that he left the base after being denied permission to go visit his mother and his fiancée; was caught sneaking back onto the base; and was terminated and returned to the United States as a result. Doc. 49, PSR at ¶ 19; Doc. 53 at 17-18, 47; Exh. 401. But we can find no support in the record for the rest of the government's allegations. Regardless, the government does not claim that Mr. Rafi was up

to anything nefarious when he left the base; rather the government merely says Mr. Rafi should have known the extensive "dangers lurking in and around the base." Doc. 56 at 22-23. This is likely because there is no evidence that Mr. Rafi was up to anything nefarious when he left the base. As Agent Blay explained it, after Mr. Rafi was caught sneaking back onto the base, "no investigation was done whatsoever by the personnel on the base"—"no search of his person"; "no search of his living quarters"; and "no search of his cellular devices." Doc. 53 at 20. The base-leaving incident falls far short of proving that Mr. Rafi intended to help free Muslimyar or provide material support to terrorists when he made his false statement.

   c.  The government further alleges with no citations to the record that a "fellow linguist" who apparently worked with Mr. Rafi reported that "Mr. Rafi had voiced opposition to the U.S. military missions in Afghanistan as far back as 2009"; that in 2019 Mr. Rafi told this person "that the FBI was investigating him because of his statements regarding jihad"; and that this person "was confused why Mr. Rafi sought the contract linguist position due to his strong opposition to the United States." Doc. 56 at 19. The government then piles on another allegation—again with no citations—that "[t]he other interpreters who worked with Mr. Rafi in Afghanistan in 2019 considered him extreme in his religious views and hatred of the United States." Doc. 56

at 19. We can find no evidentiary support for any of these claims in the record. This Court should disregard them entirely.

We assume that the "fellow linguist" the government refers to is Mohammad Karim, who in 2020 claimed that Mr. Rafi had reposted a "death to America" video (discussed above). Doc. 53 at 10-11. According to Agent Blay, Karim further claimed that during pre-deployment training with Mr. Rafi in Afghanistan in 2019, Mr. Rafi told Karim that he'd graduated from an al-Qaeda university with a name Karim thought (but Agent Blay never said he confirmed) meant "invitation to jihad"; and that Karim had found Mr. Rafi's rhetoric "similar to that of an extremist recruiter." Doc. 53 at 10-11. But Karim also reported that Mr. Rafi did not talk about anyone who was arrested, never mentioned Muslimyar or Mutawakil, and never mentioned any terrorist organizations. Doc. 53 at 51-52. Karim's unconfirmed hearsay reports about Mr. Rafi's statements during his deployment fall far short of proving that Mr. Rafi intended to help free Muslimyar or provide material support to terrorists when he made his false statement.

### (3) Post-deployment: Mr. Rafi's Facebook activity, personal travel, and years-later statements about his deployment are too remote, unintelligible, and unreliable to prove his pre-deployment intent

a. In its effort to prove Mr. Rafi's intent in making his false statement, the government relies heavily on Mr. Rafi's statements to the CHS made two

years after his deployment, and his statements to the FBI made yet another year after that. Doc. 56 at 23-30. Mr. Rafi does not dispute that he made a lot of fanciful claims to a female CHS who initiated contact with him in 2021, was "very flattering to him," told him she "respected his knowledge of Islam," and appeared "very interested" in him. Doc. 53 at 65-66; Exh. 22. As Agent Blay testified, Mr. Rafi falsely told the CHS that he went to Bagram in 2019 under an IT contract and was able to talk "the foreigners [US] in Bagram" into getting Muslimyar released. Doc. 53 at 53-57; Exh. 22. Agent Blay agreed both that "[t]here was a lot of at times exaggeration" in Mr. Rafi's claims to the CHS, and that many of his claims were demonstrably false. Doc. 53 at 54-57; Doc. 54 at 9; Exh. 22 *passim*. Additionally, there is no evidence that in Mr. Rafi's conversations with the CHS he personally advocated any acts of violence or claimed to have committed any acts of violence. Ex. 22. To the contrary—he told the CHS that the Taliban, Daesh, and al-Qaeda were not real Muslims, that their fighting/jihad was not legitimate, and that "this is not a war of weapons but of ideology." Doc. 53 at 62.

Even if these 2021 conversations provide some evidence that Mr. Rafi harbored a post hoc wish that he could have helped free Muslimyar, these conversations are too remote and unreliable to provide meaningful evidence of a 2019 *intent* to free anyone, much less a 2019 intent to provide material

support to terrorists in a manner calculated to influence or affect the conduct of government by intimidation or coercion.

b. Mr. Rafi's statements to the FBI in 2022 are similarly remote, unreliable, and unenlightening. Mr. Rafi does not dispute that he was all over the place during his interviews, piling story on top of story to explain his Facebook posts and statements to the CHS. But the government offers no coherent way of distinguishing his truths from his lies—and, most importantly, no real-world corroboration of Mr. Rafi's fanciful statements of intent that the government asks this Court to declare proof of actual intent.

Mr. Rafi told Agent Blay that he took the linguist job in Afghanistan because "I just want to go help my family, help those who are like, um, innocent to be with in a jail and something like that if I would be able to help." Exh. 12 (video clip 11). He then clarified that he was sure he could *not* help people wrongly arrested, and that he got the job "to help with the U.S. Army, the Afghan Army also, to make money, for my family support them, and I would have planned to buy a house if I would be able to work more, to make some extra cash there, because if you overseas you save more money than in the U.S." *Id*. When Agent Blay goaded Mr. Rafi to say what he would have done if "there was an opportunity" to help someone "who was arrested who shouldn't have been," Mr. Rafi appeared to explain (his English is quite rough) that he would show Facebook videos of an abuse of power to the U.S.

Army and say "this is not right," and then the Army would find the person

who abused his power and arrest him, and then the Army would tell Mr. Rafi

he had done "a good job" and even (it sounds like) call him "a hero":

> Yeah, I would be able, might be there would like one of the issue, like um I
> would share with the U.S. Army what the people on the Facebook, on one
> of the village, the people, that was the the Afghan local police, something
> like that, hit the people on the video, and I just share the video, I just
> share with the U.S. Army, [inaudible] army, and they find the person and
> they arrest him. I say this is not right, why he is doing that? Why U.S.
> Army and I went there to help people, not people with no reason they
> should be arrested or they should be hard on and they should be
> punishment. When we saw the video the [inaudible] people and [inaudible]
> taking from hands and feet hit with wood on his back [gesturing]. When I
> saw the video right away I share with the group, with the CSR group.
> When, I think it was Captain, ah, Busy (sic), when I talked to him and I
> said hey I know we have access to find this where is located please help
> him, you guys know this is inhumanity and they said yeah, in 24 hours
> they find him and they catch him and they arrest him. They said that you
> did a good job because you're a hero, why do you think that this is bad
> thing. The same thing, I went there, if I will know something is wrong,
> someone is wrong, of course I have to help them. Why the Army is going to
> help Afghan people, why I should not go there to help them?

*Id.*

Mr. Rafi admitted having said that he wanted to help Muslimyar, but

explained that was "for my excuse, because most of the people tell me why

you are going to be linguist, you should be study. I didn't have anything else

to make, and I just say well I want to go to help him." *Id.* He also told Blay

that "for this type of person [Muslimyar], hundred percent I was sure I

couldn't help." *Id.* Mr. Rafi's 2022 fever dream of becoming a hero by showing

videos to the U.S. Army and telling the Army that something is "not right" is

far from proof of a 2019 intent to provide material support to terrorists in a manner calculated to influence or affect the conduct of government by intimidation or coercion.

c.  One last note about post-deployment evidence: The government ominously reports that Mr. Rafi communicated with Muslimyar on Facebook in June of 2020, after which Mr. Rafi took a personal trip to Afghanistan (in July of 2020), after which Muslimyar was implicated in an ISIS-K attack on Kabul University (in November of 2020). Doc. 56 at 19-20. Mr. Rafi does not dispute communicating with Muslimyar or traveling to Afghanistan in 2020 (where, again, his family and fiancée lived). Doc. 54 at 18-19; Doc. 49, PSR at ¶¶ 17(a), 20. But Agent Blay was "unable to establish what it was Mr. Rafi did once he got to Afghanistan." Doc. 54 at 18. There is no evidence of any through-line from Mr. Rafi's communications and travels to the attack on Kabul University. This Court should disregard the government's implication otherwise. Placing these events next to each other on the page does not amount to proof that Mr. Rafi intended to help free Muslimyar or provide material support to terrorists when he made his false statement, much less that he had any later connection to the Kabul University attack.

**B. Even if Mr. Rafi had made his false statement intending to help free Muslimyar or others, this fact would not establish (1) an intent to provide material support to a terrorist organization (2) in a manner calculated to influence or affect the conduct of government by intimidation or coercion**

The evidence that Mr. Rafi made his false statement intending to help free Muslimyar or others is, at best, in equipoise. It is insufficient to meet the government's preponderance burden. But if this Court finds that Mr. Rafi made his false statement intending to help free Muslimyar or others, the legal question will be whether this intent satisfies the test for proving an intent "to promote[] a federal crime of terrorism." USSG 3A1.4(a).

To justify a "yes" answer to this question, the government must establish by at least a preponderance of evidence both (1) that Mr. Rafi intended for his false statement to promote the offense of providing "material support or resources to a foreign terrorist organization" in violation of 18 U.S.C. § 2339B(a);[3] and (2) that the intended "material support" offense was "calculated to influence or affect the conduct of government by intimidation or coercion." 18 U.S.C. § 2332b(g)(5)(A).[4] The government has satisfied neither prong.

---

[3] Providing material support is the only offense the government claims that Mr. Rafi intended to promote. Doc. 56 at 34.

[4] The calculation prong may also be satisfied by an intent "to retaliate against government conduct," *id.* but the government does not claim that intent here. Doc. 54 at 74-75.

**(1)As for the material-support prong**, "material support" covers

several types of "support":

> any property, tangible or intangible, or service, including currency or
> monetary instruments or financial securities, financial services, lodging,
> training, expert advice or assistance, safehouses, false documentation or
> identification, communications equipment, facilities, weapons, lethal
> substances, explosives, personnel (1 or more individuals who may be or
> include oneself), and transportation, except medicine or religious
> materials

18 U.S.C. § 2339A(b)(1) (cross-referenced in 18 U.S.C. § 2339B(g)(4)).

The government does not say which of these types of support Mr. Rafi

intended to provide, but the closest possible type appears to be "service."

"Service" "refers to concerted activity, not independent activity," and requires

that the service be provided "to" the foreign terrorist organization. *Holder v.*

*Humanitarian L. Project*, 561 U.S. 1, 23-24 (2010) (analyzing when "service"

counts as "material support" under 18 U.S.C. § 2339B(a)(1)). A person's self-

directed advocacy is not enough. Rather, consistent with the First

Amendment rights to freedom of speech and association, "[t]he statute

reaches only material support coordinated with or under the direction of a

designated foreign terrorist organization." *Id.* at 31. More to the point,

"[i]ndependent advocacy that might be viewed as promoting the group's

legitimacy *is not covered*." *Id.* at 31-32 (emphasis added).

The government has pointed to no evidence that Mr. Rafi engaged in any

advocacy or intended to do so "coordinated with or under the direction of"

ISIS-K or any other foreign terrorist organization. The government theorizes that Mr. Rafi intended to promote terrorism by "offering himself" to ISIS-K to "help[] their recruiters get released from imprisonment." Doc. 56 at 35-36. But the government presented no evidence that Mr. Rafi intended, offered, or tried in any way to coordinate efforts with or for ISIS-K.[5]

Indeed, even if Mr. Rafi made his false statement intending to help free Muslimyar or others, his only plan (assuming his post-hoc statements demonstrated a pre-deployment plan) was to coordinate *with the U.S. Army*, not with ISIS-K. And he planned to do that by independently advocating—through speech—for the protection of people he thought had been wrongfully treated.

The government cannot articulate a cognizable legal theory of material support based on this record. Mr. Rafi's reposting of pro-ISIS videos and fantasies about convincing the U.S. Army to take action based on nothing more than his advice and declare him a hero who had done a "good job" afterwards "is not covered" by the material-support statute. *Id.* at 32; *see also United States v. Osadzinski*, 97 F.4th 484, 493 (7th Cir. 2024) ("section 2339B

---

[5] Mutawakil and Muslimyar were only accused of recruiting for ISIS-K; they were not considered leaders or even members of ISIS-K. Doc. 54 at 44. Furthermore, the evidence before this Court suggests Mr. Rafi questioned whether Muslimyar was, in fact, a recruiter for ISIS-K. Doc. 53 at 59, 61, 64-65, 70-71.

does not prohibit persons from expressing sympathy for the views of a foreign terrorist organization"); *Gerwaski v. State ex rel. Bd. of Regents of the Nevada Sys. of Higher Educ.*, 2025 WL 1294107 (D. Nev. 2025) (organizations' public speech on the Israeli-Palestinian conflict could not be interpreted as "a serious expression of intent to harm any particular individual" and did not constitute material support); *In re Terrorists Attacks on September 11, 2001*, 740 F.2d 494, 519, 522-523 (S.D.N.Y. 2010) ("one is free to espouse support for a foreign terrorist organization, and to engage in independent advocacy as a means to sway others into adopting one's pro-terrorist point of view"; claim that Islamic organization published statements by al-Qaeda's spiritual leaders online "as a means of achieving its own goal to promote the spread of fundamentalist Islam" alleged only "independent activities" and not "material support").

**(2)As for the calculation prong**, the government must establish that the material-support offense Mr. Rafi allegedly intended to promote was not just "calculated to influence or affect the conduct of government," but that it was calculated to do so "by intimidation or coercion." 18 U.S.C. § 2332b(g). The government relies primarily on Mr. Rafi's "disdain or hatred of the United States" to claim the required calculation. Doc. 56 at 37-38. This vague claim is not enough—it fails to establish either piece of the calculation prong. On top of that, the government's "hatred" claim is based on an unsourced

allegation about vague statements from unnamed "other interpreters" who allegedly worked with Mr. Rafi. Doc. 56 at 19. This Court should reject this claimed basis for the calculation prong.

As for legal support, the cases the government cites in its calculation section are materially distinguishable, and illustrate the absence of sufficient evidence to support the calculation prong here. In *United States v. Alowemer*, 96 F.4th 386, 389 (3d Cir. 2024), the defendant admitted (1) an intent to retaliate against government conduct ("calculated to influence or affect . . . or retaliate"); and (2) plotting to bomb a church ("by intimidation or coercion"— though we note this element is not required in retaliation cases, 18 U.S.C. § 2332b(g)(5)(A)). In *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014), the defendant (1) admitted an end goal of defeating Ethiopian troops in Somalia assisting a transitional government ("calculated to influence or affect"); and (2) helped men travel to Somalia "so that the men could fight against the Ethiopian troops" ("by intimidation or coercion"). In *United States v. Kahn,* 938 F.3d 713 (5th Cir. 2019), the defendant (1) successfully encouraged a person to join ISIS, an enemy of the United States ("calculated to influence or affect"); and (2) funded the person's travel to Iraq to fight in a civil war ("by intimidation or coercion"). And in *United States v. Ali*, 799 F.3d 1008 (8th Cir. 2015), the defendants (1) acted as fundraisers for a terrorist organization ("calculated to influence or affect"); (2) while expressly

28

celebrating and endorsing killings of the organization's enemies ("by intimidation or coercion"). Finally, in *United States v. Ansberry*, 976 F.3d 1108 (10th Cir. 2020), the defendant (1) intended to avenge the killing of a friend by a law-enforcement officer ("calculated to retaliate"); and (2) did so by planting a bomb at the police station ("by intimidation or coercion").

In stark contrast to these cases, there is no evidence here to support the "intimidation or coercion" element. Mr. Rafi never personally advocated any acts of violence or claimed to have committed any acts of violence. Ex. 22. To the contrary—he told the CHS that the Taliban, Daesh, and al-Qaeda were not real Muslims, that their fighting/jihad was not legitimate, and that "this is not a war of weapons but of ideology." Doc. 53 at 62. Mr. Rafi's design (if he had one) was not to influence or affect governmental conduct through planting a bomb, sending someone off to war, or encouraging violence. It was to use his words to convince the U.S. Army to secure the release of people he thought were wrongfully detained. The enhancement does not apply here.

WHEREFORE, Mr. Rafi asks this Court to sustain all of his PSR objections, including his objection to the terrorism enhancement.

Respectfully submitted,

s/ Tim Burdick
TIM BURDICK  #78152
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas  66101
Telephone: (913) 551-6712
Fax: (913) 551-6562
E-mail: Tim_Burdick@fd.org

s/ Paige Nichols
PAIGE NICHOLS, #16400
Assistant Federal Public Defender
632 Van Buren St., Suite 200
Topeka, Kansas  66603
Telephone: (785) 232-9828
Fax: (785) 232-9886
E-mail: Paige_Nichols@fd.org

## Certificate of Service

I certify that on September 4, 2025, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Scott Rask
Assistant United States Attorney
Scott.Rask@usdoj.gov

s/ Tim Burdick
TIM BURDICK  #78152